**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 21-276 (CKK)** |
| **CLIFFORD MACKRELL,** | |
| **Defendant.** | |

**MOTION TO DISMISS RESTRICTED AREA CHARGES**
**UNDER 18 U.S.C. § 1752(a) (COUNTS THREE, FOUR, AND FIVE)**

Clifford Mackrell, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 12(b)(3), hereby respectfully requests that the Court dismiss Counts Three, Four, and Five of the Superseding Indictment ("SI"), ECF 31, which charge him with violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 18 U.S.C. § 1752(a)(4), respectively. All three counts fail to adequately allege violations of § 1752(a). Specifically, Counts Three, Four, and Five do not, and cannot, allege the "restricted buildings or grounds" element of § 1752(a).  In addition, § 1752(a)(2) is unconstitutionally vague and overbroad. Accordingly, both Counts must be dismissed.[1]

---

[1] Undersigned counsel acknowledges that Courts in this district have considered and denied similar motions regarding this issue.

## BACKGROUND

The operative indictment alleges six counts against Mr. Mackrell relating to the events at the U.S. Capitol on January 6, 2021.  In relevant part, Count Three alleges that Mr. Mackrell:

> did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so . . . .

SI at 2.  Count Four alleges that Mr. Mackrell:

> did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions . . .

*Id* at 3.

Count Five alleges that Mr. Mackrell:

> Did knowingly, engage in any act of physical violence against any person and property in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting. . . .

*Id*.

Section 1752 prohibits conduct in or "proximat[e] to" "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c)(1); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

## ARGUMENT

## I. Counts Three, Four, and Five Each Fail to State an Offense Because the "United States Capitol and its Grounds" Could Not Constitute "Restricted Buildings or Grounds" Under § 1752.

In both counts, the government alleges that "the United States Capitol and its grounds" were "restricted" from Mr. Mackrell specifically and solely because "the Vice President was temporarily visiting" that entire location. The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds somehow become "restricted grounds" on January 6, 2021 because of a "temporar[y]" vice-presidential "visit[]," as the government asserts.

The Vice President's relationship to Congress and the Capitol building is significant. The Vice President is an institutional player in Congress. His or her role in the Senate is embedded in the very structure of the Legislative Branch: the Vice

President serves as the "President of the Senate" and is responsible for providing the tie-breaking vote. U.S. CONST. art. I, § 3, cl. 4. The Vice President is routinely present in the Capitol building to fulfill his or her constitutional obligations. By way of example, Vice President Pence traveled to the Senate thirteen times in his tenure just to cast tie-breaking votes; and Vice President Kamala Harris traveled to the Senate fifteen times in 2021 alone to cast tie-breaking votes.[2] Further, the Constitution and federal law obligate the Vice President, at a set date and time, to preside over and participate in the process by which electoral votes for the office of the Presidency and Vice Presidency are opened, counted, and certified. U.S. CONST. amend. XII; 3 U.S.C. § 15.

To that end, the Vice President has a dedicated, *permanent* office reserved for his or her use in the Senate. That office has existed since at least the early nineteenth century.[3] The Vice President's "close proximity . . . to the Senate chamber has allowed the vice president easy access to the members when the Senate is in session," including "lobbying senators to vote against legislation [s]he oppose[s] and frequently lecturing senators on procedural and policy matters."[4] The Vice President's Room in

---

[2] U.S. Senate, *Votes to Break Ties in the Senate*, https://tinyurl.com/ye8t4nu8 (last visited June 9, 2022) [hereinafter "*Votes to Break Ties in the Senate*"].

[3] U.S. Senate, *About the Vice President (President of the Senate)*, https://tinyurl.com/2p8n43y9 (last visited June 9, 2022).

[4] Office of the Senate Curator, *The Vice President's Room*, S. Pub. 106–7, https://tinyurl.com/3wyb9web (last visited June 9, 2022) [hereinafter "*The Vice President's Room*"], at 3 (first quotation); *see* U.S. Senate, *About the Vice President — Historical Overview*, https://tinyurl.com/46rhuwyk (last visited June 9, 2022)

the Senate building has hosted "ceremonial functions, informal party caucuses, press briefings, and private meetings" for decades.[5]  Unsurprisingly, given its frequent and important use, the office is not a drab holding space; it is appointed with mahogany furniture, a marble fireplace mantel, and fine art.[6]  In contrast to the longstanding permanent office in Congress, the Vice President did not have an office in the West Wing of the White House until 1977.[7]

In addition, "[t]he United States Capitol is a unique situs for demonstration activity and is a place traditionally open to the public—thousands visit each year— to which access cannot be denied broadly or absolutely." *Wheelock v. United States*, 552 A.2d 503, 506 (D.C. 1988) (cleaned up).  It "may not be declared off limits to the people." *United States v. Nicholson*, Op. at 3 (D.D.C. June 19, 1969) (Green, C.J.), reprinted as Appendix in *Dellums v. Powell*, 566 F.2d 167, 198 (D.C. Cir. 1977).

**A.    The United States Secret Service ("USSS") Did Not Designate, Post, Cordon Off, or Otherwise Restrict the Entire Capitol Building and All of its Grounds In Relation to the Vice President's Presence There on January 6, 2021.**

---

[hereinafter "*Historical Overview*"] (second quotation) (describing the "active role" of John Adams).

[5] *The Vice President's Room*, supra note 5, at 3.

[6] *Id.* at 4–6.

[7] "Mondale was the first vice president to have an office in the West Wing of the White House." *The career of Walter Mondale, Carter's vice president, in pictures*, NBC News, Apr. 20, 2021, https://tinyurl.com/5bxc5xns (last visited June 9, 2022); *accord* Brock Brower, *The Remaking of the Vice President*, N.Y. TIMES, June 5, 1977, https://www.nytimes.com/1977/06/05/archives/the-remaking-of-the-vice-president.html  (last visited June 9, 2022) ("Jimmy Carter allowed Fritz Mondale not just Whi[t]e House-room but his pick of any office that wasn't oval.").

Section 1752 was enacted to permit the USSS to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Thus, § 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." 18 U.S.C. § 1752(d)(2). Nothing in the language of the statute permits or suggests that any entity other than the USSS has the authority to post, cordon-off, or otherwise restrict an area such that someone who enters or remains in that area may be subject to criminal prosecution under § 1752.

The legislative history bolsters this interpretation. The Senate Judiciary Committee report accompanying the current version of § 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

The USSS did not designate, post, cordon-off, or otherwise restrict the entire Capitol Building and its entire grounds in relation to the Vice President's presence there for the electoral vote count on January 6, 2021. Indeed, it appears that the USSS designated, posted, cordoned off, and otherwise restricted solely the area within a few feet of Vice President Pence at any given time—if any area at all—in

connection with his presence at the Capitol.  Restrictions imposed on entering the Capitol buildings or grounds that had nothing to do whatsoever with Vice President Pence's presence cannot provide the basis for criminal prosecution under § 1752.

### B. The Vice President Was Not "Temporarily Visiting" the "Capitol and its Grounds."

For Counts Three, Four, and Five to allege the "restricted buildings or grounds" element of § 1752(a), as charged, the Capitol and/or its grounds must have been a place the Vice President was "temporarily visiting" when presiding over the opening, counting, and certification of electoral votes.  The meaning of "temporarily visiting" and, in turn, the sufficiency of the allegations are questions of law for the Court to decide.  *See United States v. Jabr*, 2019 WL 13110682, at *6–7 (D.D.C. May 16, 2019).

The plain meaning of "temporarily visiting" does not encompass conducting official business at one's own permanent office or place of business.  And if the term could plausibly encompass that conduct (contrary to the plain meaning and ordinary person's understanding), then the statute is ambiguous and lenity requires a narrower construction.  Because the statute simply does not apply here, all three Counts should be dismissed.

The phrase "temporarily visiting" is not defined by statute, so its ordinary meaning, fixed at the time of enactment, controls. *See, e.g.*, *Burrage v. United States*, 571 U.S. 204, 210–12 (2014) (where Controlled Substances Act did not define "results from," the Court gave that phrase its "ordinary meaning"). Based on dictionary definitions of "temporarily" and "visiting" from about 1971, when § 1752 was enacted, "someone is 'temporarily visiting' a location if they have gone there for a particular

7

purpose, be it business, pleasure or sight-seeing, and for a limited time, which could be brief or extended while nonetheless remaining temporary." *United States v. McHugh*, 2022 WL 296304, at *20 (D.D.C. Feb. 1, 2022) (internal quotation marks omitted).

Two guardrails attend that definition. First, the phrase "temporarily visiting" includes an implicit normally-lives-or-works carveout because the ordinary person would not "describe an ordinary commute from home to one's regular workplace as 'temporarily visiting' the office." *Id.* at *22; *see Wooden v. United States*, 142 S. Ct. 1063, 1069 (2022) (construing "occasions" in § 924(e)(1) in light of "how an ordinary person . . . might describe" it "*and how she would not*" (emphasis added)); *see also, e.g.*, *Young v. United States*, 943 F.3d 460, 463 (D.C. Cir. 2019) (construing "imposed" in § 401(c) of the First Step Act according to its "ordinary usage").  Indeed, because the plain meaning of "visit" denotes a time limitation unconnected to the word "temporary," the words "temporarily visiting" together connote temporary travel to some location where a person does not normally reside or work on a regular basis for some purpose other than a person's regular job activities.  Second, "temporarily visiting" should not be interpreted as though it means "physically present" because that is not what Congress wrote. *See McHugh*, 2022 WL 296304, at *22. If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee is or will be physically present, then it would have omitted the phrase "temporarily visiting" or actually written "physically present."

It follows that Vice President Pence was *not* "temporarily visiting" the Capitol when fulfilling his constitutional obligations. He was simply at work that day. The Constitution obligates the Vice President to be physically present in the Senate with some frequency, not only to preside over the opening, counting, and certification of electoral votes every four years but also to cast tie-breaking votes as needed on legislation and judicial nominations. And the number of times Vice Presidents Pence and Harris have been present in Congress over the last five years solely to provide tie-breaking votes—28 times—speaks to the frequent, routine nature of the Vice President's work in the Capitol.[8] In other words, the Vice President does not "temporarily visit" the Capitol—he or she works there.

That conclusion is consistent with the weight of history. The Vice President has had an office in Congress and conducted official business from that office since nearly the Founding. Historically, vice presidents are in the Capitol not only for the electoral vote certification, but also to cast tie-breaking votes, lobby senators, and hold "informal party caucuses, press briefings, and private meetings" from that office.[9] Critically, when Congress enacted § 1752 in 1971, the Vice President *did not even have an office in the West Wing*.[10] In other words, Congress enacted § 1752(a)(1) with the background understanding that the Vice President's office historically has been and remained in the Capitol building. *See, e.g.*, *Abuelhawa v. United States*, 556

---

[8] *Votes to Break Ties in the Senate*, *supra* note 3.

[9] *The Vice President's Room*, *supra* note 5, at 3; *Historical Overview*, *supra* note 5.

[10] *See* Pub. L. No. 91–644, 84 Stat. 1891 § 18 (Jan. 2, 1971).

U.S. 816, 823–24 (2009) (declining to interpret 21 U.S.C. § 843(b) to reach a result in conflict with the background understanding against which Congress legislated). Accordingly, there is no reason to think that, at the time it enacted § 1752, Congress understood the Capitol could be somewhere the Vice President "temporarily visit[s]."

A more capacious reading of "temporarily visiting" transforms that phrase into a "physically present" requirement that is noticeably absent from the statutory text. Treating the Vice President's performance of his constitutional obligations in his established place of work as a "temporary visit" blurs the distinction between travel to ordinary places of business for repeat purposes and limited travel to a location "for a particular purpose . . . and for a limited time." *See McHugh*, 2022 WL 296304, at *20 (internal quotation marks omitted). As the court in *McHugh* pointed out, the dictionary definition of "temporarily visiting," coupled with commonsense and everyday experience, means § 1752(c)(1)(B) refers to the latter, not the former. *See id.* Otherwise, *everywhere* the Vice President travels outside his residence would constitute somewhere he is "temporarily visiting." And if Congress wanted to define "restricted building or grounds" to encompass anywhere the President or a Secret Service protectee is or will be physically present, then it would have done so. *See id.* at *22; *see also, e.g.*, *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (where plaintiffs' preferred interpretation simply was "not what the statute says," court of appeals declined to "scrub up for statutory surgery, excising some words and engrafting others," in order to adopt it).

The absurdity of treating the entire Capitol building and its entire grounds as "restricted buildings and grounds" under § 1752(c)(1)(B) merely on account of the Vice President's physical presence there to do his job is apparent when compared to the statute's application in other cases. For example, courts have held that "temporarily visiting" reaches an area near an airport hangar and a portion of a park restricted by the Secret Service ahead of a rally at which the President or Vice President appeared. *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (airport hangar); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (unpublished) (park). Airport hangars and parks are natural fits for the phrase "temporarily visiting," given the ordinary person's understanding that one "temporarily visits" a location where the person does not normally live or work. *See McHugh*, 2022 WL 296304, at \*21. Meanwhile, the Vice President's time in the Capitol, where he has a permanent office and frequently must appear to fulfill his constitutional obligations, is entirely unlike a brief stop in an airport hangar or park to give a one-off speech. *See also Jabr*, 2019 WL 13110682, at \*7–10 (plain meaning of "the White House or its grounds" in § 1752(c)(1)(A) did not include "the U.S. Treasury Building and its grounds").

Courts that have ruled on this issue have reasoned that "the Vice President's working office is in the West Wing" and "anyone with a working knowledge of modern American government" understands that the Vice President "is principally an executive officer who spends little time at the Capitol and likely even less in her 'office' there." *See, e.g.*, *McHugh*, 2022 WL 296304, at \*22. Thus, the rationale is that Vice President Pence was "temporarily visiting" his own office at the Capitol (even

though the ordinary person understands that one does not "temporarily visit" one's own office) because the Vice President has another office that everyone supposedly knew he used more frequently. In shoehorning this theory into § 1752(c)(1)(B), the courts have rejected the ordinary person's understanding of what "temporarily visiting" means when it comes to the Vice President, specifically, without any basis in the statutory text.

That faulty logic creates fair notice problems. Due process requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Nothing in the statutory text signals to the reader that the ordinary meaning of "temporarily visiting" applies to the Vice President differently than any person. Plus, under that reasoning, the regularity of the Vice President's physical presence in the Capitol building, judged against "modern" practice, dictates whether he is "temporarily visiting" that building, which, in turn, dictates whether an individual is unlawfully in a "restricted area." As a result, the statute's reach expands and contracts based on fluid, unidentified factors—the frequency with which the Vice President casts a tie-breaking vote, his personal preference for working in his Senate office, his travel schedule, etc. Such indeterminacy provides no parameters by which the ordinary person can discern when the Vice President is "temporarily visiting" a public government building and, in turn, know when the building is "restricted" for purposes of § 1752(a); it specifies "no standard of conduct at all." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Coates v. Cincinnati*, 402

U.S. 611, 614 (1971)); *see also, e.g., United States v. Davis*, 139 S. Ct. 2319, 2324, 2336 (2019) (holding that § 924(c)(3)(B) is unconstitutionally vague, given that its "language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence").

In *United States v. Class*, the D.C. Circuit recently assessed whether 40 U.S.C. § 5104(e), which prohibits the possession of firearms on the grounds of the Capitol, was unduly vague on account of the law making it difficult to determine whether a certain parking lot fell within the restricted area. 930 F.3d 460 (D.C. Cir. 2019). The Court of Appeals held that the law was not vague because it defined the restricted area "by a map and a specific list of intersections and streets that are part of the public law," meaning, "[a] citizen concerned about violating the ban need not . . . speculate about the uses the various parcels of land. He must simply . . . open the statute book—even if here he may need two." *Id.* at 468. By comparison, under *McHugh*'s—and the subsequent opinions—reading of § 1752(c)(1)(B), the ordinary person could not look to a statute book (or even along a "circuitous route" of resources) to determine if the Capitol building is "restricted" on account of the Vice President "temporarily visiting" it. *Cf. Class*, 930 F.3d. at 467. Instead, the law would be fluid and subject to sudden change. Indeed, even if the "ordinary person" is someone "with a working knowledge of modern American government" (which the defense doubts), *McHugh*, 2022 WL 296304, at *22, she would have no reason to think the modern Vice President "likely spends little time" in his Senate office based on recent

observations—Vice Presidents Pence and Harris have been in the Capitol nearly thirty times in the last few years *just* to provide a tiebreaker vote. As such, *McHugh*'s interpretation of § 1752(c)(1)(B) does not provide the "sufficient definiteness" that due process requires.

To the extent "temporarily visiting" is ambiguous, principles of lenity and constitutional avoidance counsel in favor of a narrower construction. The most straightforward (and correct) reading of "temporarily visiting" is the one *McHugh* discerned and should have applied: a Secret Service protectee's travel to a location for a particular purpose and lasting a limited time, excluding travel to and from the protectee's own place of work. Alternatively, as the court in *McHugh* concluded, the phrase might be read more broadly to reach a Secret Service protectee's temporary travel to his own office, provided the ordinary person knows that, in recent years, the protectee does not spend much time in that office (but instead, uses primarily another office). 2022 WL 296304, at *22.

Principles of lenity compel the narrower construction. A defendant should not suffer surprise at the hands of an ambiguous law; "when the government means to punish, its commands must be reasonably clear." SCALIA & GARNER at 299; *accord Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). Thus, when a reasonable doubt persists about a statute's meaning even after employing tools of statutory interpretation to try to resolve it, the court should adopt the reading that favors the defendant. *See Moskal v. United States*, 498

14

U.S. 103, 108 (1990); *accord, e.g.*, *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1246 (D.C. Cir. 2008) (rule of lenity, as described in *Moskal*, supported adopting narrower construction of 18 U.S.C. § 1028A(a)(1)).[11] Here, in applying the rule of lenity, the Court should read "temporarily visiting" in § 1752(c)(1)(B) to exclude the Vice President's presence at the U.S. Capitol to conduct business. Such a reading is consistent with the ordinary person's understanding of the phrase, avoids a vague and obscure description of when a protectee's travel to a place triggers criminal liability under § 1752(a) for those in the vicinity, and accords with the course the Supreme Court has charted. *See, e.g.*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 n.8, 408–09 (2003) (applying rule of lenity when construing "obtain" in the Hobbs Act and favoring "the familiar meaning of the word" over a "vague and obscure" description); *Miller* slip op. at 28 (after concluding § 1512(c)(2) was subject to "two plausible interpretations," adopting the narrower interpretation in light of principle of lenity and dismissing count for failure to allege an offense within that

---

[11] There is ambiguity in the case law over the level of ambiguity required to trigger the rule of lenity. While some statements from the Supreme Court suggest the rule applies only where there is a "grievous ambiguity," the rule's historical origins indicate a less stringent standard. *See, e.g.*, *Wooden*, 142 S. Ct. at 1084 (Gorsuch, J., concurring) ("This 'grievous' business does not derive from any well-considered theory about lenity or the mainstream of this Court's opinions. Since the founding, lenity has sought to ensure that the government may not inflict punishments on individuals without fair notice and the assent of the people's representatives."); *Miller* slip op. at 9 (describing conflicting standards for applying rule of lenity); *see also* SCALIA & GARNER at 298–99 (acknowledging various standards exist for applying rule of lenity and opining that *Moskal*-stated standard most closely aligns with the rule's policy interest in visiting the consequences of an ambiguous law "on the party more able to avoid and correct the effects of shoddy legislative drafting"). Even if the standard is "grievous ambiguity," rather than persistent doubt, lenity counsels in favor of the narrower construction of § 1752(c)(1)(B).

narrower meaning); *Guertin*, 2022 WL 203467, at *3–4 (to the extent any question remained about whether indictment alleged an offense under § 1343 based on whether "obtaining money or property" could mean "maintaining money or property," lenity counseled in favor of resolving that ambiguity in defendant's favor; count dismissed).

Similarly, principles of constitutional avoidance counsel in favor of adopting the reading of the statute that does not raise questions about the statute's legitimacy. The presumption of constitutionality and the constitutional-doubt canon allow the judiciary to uphold ambiguous legislation. The former "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional" and the latter "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality." *Davis*, 139 S. Ct. at 2332 & n.6; SCALIA & GARNER at 247–48. In light of the due process concerns that attend construing the statute to reach a Secret Service protectee's presence at the U.S. Capitol, contrary to ordinary understanding and based on that individual protectee's personal predilections and practices, this Court should decline to adopt that reading. *See, e.g.*, *United States v. Cano-Flores*, 796 F.3d 83, 91–94 (D.C. Cir. 2015) (constitutional avoidance principles counseled reading statute not to authorize imposition of forfeiture, based on total revenue of conspiracy, on mid-level manager defendant, given Eighth Amendment concerns).

In the end, the allegations simply do not align with the statute's text. A person does not "temporarily visit" his own office or place of business, even when that person

is the Vice President of the United States. Counts Three, Four, and Five should be dismissed because the allegations, even if proven, would not be sufficient to permit a jury to find that a violation of § 1752(a) was committed. *See, e.g.*, *Guertin*, 2022 WL 203467, at *2–6 (dismissing count that could not state an offense under § 1343 as a matter of law based on theory alleged; wire fraud statute does not criminalize scheme to "maintain" something); *Payne*, 382 F. Supp. 3d at 76–77 (dismissing indictment that could not state an offense under § 922(g)(1) as a matter of law based on theory alleged; prior convictions had been expunged by certificates that did not expressly include prohibition on firearm possession and, therefore, could not support § 922(g)(1) charge); *Brown*, 2007 WL 2007513, at *3–5 (dismissing counts in indictment that failed to allege violation of § 1512(c)(2) as a matter of law based on theory alleged; D.C. Superior Court grand jury allegedly obstructed was not a "Federal grand jury" within the meaning of § 1515(a)(1)).

If there is a gap in the statute, then it is for the legislature, not the judiciary, to fill. Stretching § 1752(c)(1)(B) to fit one random particular event in history—to which it plainly does not apply—is not an appropriate or constitutionally-valid solution. Instead, "[r]espect for due process and the separation of powers suggests a court may not, in order to save Congress th[at] trouble, . . . construe a criminal statute to penalize conduct it does not clearly proscribe." *Davis*, 139 S. Ct. at 2333. The Constitution envisions that expansions of law come from Congress, not courts. *See, e.g.*, *Scheidler*, 537 U.S. at 409 ("a significant expansion of the law's coverage must come from Congress, and not from the courts.").

To be clear, concluding that the allegations here fall outside the ambit of § 1752(c)(1)(B) does not undermine the government's ability to prosecute those who enter the Capitol building or grounds unlawfully or those who threaten the Secret Service's protection of the Vice President. *See, e.g.*, 18 U.S.C. § 3056(d); 40 U.S.C. § 5104(e). Further, the government remains free to prosecute violations of § 1752(a) based on the Vice President's "temporar[y] visit" to a location *other than* his own office building "for a particular purpose . . . and for a limited time." *Cf. McHugh*, 2022 WL 296304, at *20.

## II.   Count Four Should Be Dismissed Because Section 1752(a)(2) is Unconstitutionally Vague and Overbroad.

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The void-for-vagueness doctrine protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender*, 461 U.S. at 358).

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson*

*v. United States*, 576 U.S. 591, 595 (2015) (quoting *Connally v. General Constr. Co.*,

269 U.S. 385, 391 (1926)). As the Supreme Court has explained,

> [i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basis First Amendment freedoms, it operates to inhibit the exercise of those freedoms.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (internal citations and

quotations omitted). As mentioned by the Supreme Court in *Grayned*, vagueness

concerns are most acute when the statute imposes criminal penalties and implicates

the First Amendment by chilling exercise of protected expression. *See Kolender*, 461

U.S. at 358-59 n. 8; *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498-99

(1982); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (Where "a statute's literal

scope [reaches] expression sheltered by the First Amendment, the [vagueness]

doctrine demands a greater degree of specificity than in other contexts.").

Section 1752(a)(2) contains vague and imprecise terms and phrases that fail to

provide a person of ordinary intelligence a reasonable opportunity to know what

conduct is prohibited and invite arbitrary law enforcement. "[I]mpede or disrupt the

orderly conduct of Government business or official functions," which language

appears twice in the statute, includes within its plain meaning acts such as pure

speech, expressive conduct, and lobbying.  And "within such proximity to any restricted building or grounds" provides no clear limit on where exactly the statute applies.

## CONCLUSION

For the foregoing reasons, and for any other reasons set forth in additional pleadings or at a hearing on this motion, and that this Court may deem just and proper, the Court should grant this motion and dismiss Counts Three, Four, and Five of the operative indictment.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Jose A. German
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500