UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLIFFORD MACKRELL,<br><br>    Defendant. | Crim. Action No.: 1:21CR276 |

**MEMORANDUM IN AID OF SENTENCING**

When he was 19 years old, Clifford ("Cliff") Mackrell's father invited him to take a road trip from their home in Ohio down south to Florida. Cliff's relationship with his father had been fraught and full of conflict since his parents' divorce years earlier. Eager to spend quality time with his dad whom he had always revered in spite of the conflict, Cliff agreed to go. They set off from Ohio on or about January 4, 2021, stopping along the way. At some point, Cliff's dad suggested that they make a pit stop in Washington, D.C., to attend the rally to show support for President Trump, whom they both admired. Cliff's dad brought gas masks because they heard that Antifa and other counter protestors were going to be stirring things up at the rally.

Father and son arrived at the Ellipse in time to hear some speeches. After the speeches, they followed the swell of the crowd towards the Capitol grounds. Once on the grounds, Cliff followed his dad to the west front area. Once there, father and son moved towards the police barricade. The crowd was chaotic. It was the largest crowd Cliff had ever seen. People around him were screaming and yelling. Cliff briefly lost

his dad in the commotion of the crowd. Tear gas burned his eyes. He panicked. In the stress of the moment, he reacted in a manner contrary to how he had lived his life for the past 19 years. During the span of about six minutes, he swung at police officers, with his father at times beside him, also swinging at officers. Cliff did not use a weapon and he did not injure anyone. He never attempted to enter the Capitol building. When the crowd dispersed, Cliff and his dad left. In the days and months following January 6, Cliff began to realize that he had been part of a terrible event in this nation's history. He accepted responsibility through his plea agreement without reservation. He has already experienced the consequences for his conduct. Immediately following his guilty plea in this matter, Cliff was fired from his job at a tire shop due to his felony conviction.

Clifford Mackrell, through counsel, states that he has reviewed the Pre-Sentence Report (PSR) and offers no objection to the guidelines calculation of 24 to 30 months. However, counsel submits that Cliff's youth—he was two weeks shy of his 20th birthday—and mental health struggles at the time of his offense militate in favor of a sentence that does not include a period of incarceration. For the reasons that follow, a sentence of probation, with conditions such as home confinement and mental health treatment, is sufficient but no greater than necessary to achieve the goals of sentencing.

I. **Procedural History**

Clifford Mackrell was arrested on a warrant charging him with various offenses arising out January 6, 2021, on March 17, 2021. Initially, only Clifford

2

Mackrell was charged. Clifford and his father, Michael Mackrell, were charged by superseding Indictment on March 29, 2023. On October 19, 2023, Clifford Mackrell pleaded guilty to Count Two, one count of assault on an officer, in violation of 18 U.S.C. § 111(a)(1). Clifford Mackrell has been largely compliant with conditions of release since his arrest three years ago.

## II. Application of the sentencing factors

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Honest application of the federal sentencing statute confirms that a sentence of probation to include community service is sufficient but no greater than necessary to meet the goals of sentencing. What follows is a detailed review of the relevant §3553(a) factors.

### i. **Clifford Mackrell's history and characteristics support a probationary sentence**.

Clifford Mackrell was born on January 19, 2001, to Michael and Kristen Mackrell. He was born and raised in North Olmstead and Parma Ohio, rural communities one hour outside Cleveland. Michael and Kristen divorced when Cliff was ten years old. Following the divorce, he bounced back and forth between his parents' homes. While Cliff enjoys a strong relationship with his mother, his relationship with his father has been rocky. They are both stubborn and when Cliff was a teenager, they argued constantly. Nevertheless, Cliff looked up to his father, a former U.S. Marine. Cliff has two siblings, a half-brother, and two step-siblings.

Cliff was diagnosed with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. As a result, he struggled in school. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. He would welcome therapy, though has not been referred for treatment through pre-trial services.

Cliff graduated from Wellington High School in 2019. He spent his senior year taking vocational classes, specializing in mechanics. After high school, Cliff was consistently employed—at a roofing company, a diesel shop, and later a tire shop—until he was convicted of the instant offense. After his guilty plea, the tire shop let him go citing his felony conviction. He has been looking for work ever since.

    a. **Cliff's friends and family describe him as generous, kind, and reliable.**

As the Court can see reflected in the video testimonials and letters submitted to chambers, Cliff has a small but supportive group of friends. To a person, they describe him as generous, kind, and reliable. His friend, Sean Harris, describes how Cliff is the one person he thought to call at 5 a.m. to watch his infant son when he had to take his wife to the hospital. Another family friend describes how Cliff will be the first person to offer to shovel his driveway when it snows.

Cliff has also been a reliable employee and worked since graduating from high school. Unfortunately, he was fired from his most recent position due to this case.

### b. A downward variance is appropriate given Clifford Mackrell's age at the time of the offense.

It cannot be ignored that Cliff was still a teenager when he went to the Capitol with his father on January 6. As a 19-year-old, he is among the youngest January 6 defendants to be sentenced. Cliff's youth and immaturity at the time of the offense bears on his culpability because "there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average."[1] Studies on brain development in adolescents by the National Institutes of Health show that the prefrontal cortex, the "executive" part of the brain important for controlling reason, organization, planning, and impulse control, does not fully mature until the early twenties.[2] The same National Institutes of Health study showed that the region of the brain that inhibits risky behavior is not fully formed until age 25.[3] Before the brain is fully developed, there is a tumultuous stage of brain development when the limbic system (the areas of the brain responsible for detecting external threats and generating emotions, including the "fight or flight response") is overstimulated by sex hormones such as testosterone, while the prefrontal cortex (the portion of the brain responsible for impulse control and reasoning) is still immature and undergoing

---

[1] USSC, Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015 (2017),https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2017/20170525_youthful-offenders.pdf.

[2] Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 Annals N.Y. Acad. Science 105-09 (June 2004).

[3] Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate*, , Feb. 1, 2005, at A01.

extensive reorganization.[4] The imbalance and inconsistent coordination between these two areas of the brain, which persists well into the mid-20s, makes young people more prone to risky behavior and less capable of making rational decisions when they are emotionally aroused.[5]

The Supreme Court has also recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, young people "have diminished culpability and greater prospects for reform." *Id.*; *see also Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).

In determining an adequate sentence, this Court should take into account the understanding among experts that the brain of a 19-year old is different from that of the adults this Court more commonly sentences. Moreover, in Cliff's case, the Court

---

[4] *See* Laurence Steinberg, *Age of Opportunity: Lessons from the New Science of Adolescence* 69–72 (2014); Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 451–55 (2013).
[5] Steinberg, *supra* note 4, at 77.

6

should consider that he was a 19-year-old following his father, someone who had an outsized influence in his life.

> ii. **The nature and circumstances of the offense support the requested sentence**.

Cliff and his father were on the road, headed down south from their home in Ohio, when his father suggested that they attend the Stop the Steal rally. Cliff had supported President Trump, though he was not a particularly ardent supporter. Cliff agreed that the two should stop at the rally. Cliff's dad had purchased gas masks because he had heard that counter protestors were going to be at the rally, stirring up trouble. After hearing some of the speeches, Cliff and his father followed the crowd to the Capitol grounds. The crowd was chaotic and large – the largest crowd Cliff had ever been a part of. He saw protestors clashing with police officers and tear gas burned his eyes. Cliff's offense conduct is clearly laid out in the statement of offense. He has watched the videos of himself that day with shame and regret. He is grateful no one was injured as a result of his conduct. After January 6, he did not publicly post about what happened or otherwise publicly glorify the horrible day. Instead, the day after, he sent a handful of private messages to a friend. In one message he expressed that he did not like hearing that people went inside the Capitol and stole items. When agents came to arrest him, he was cooperative and polite. With the exception of a few positive tests for marijuana (one was the result of a legal substance, CBD), he has been totally compliant with conditions of release since his arrest.

### iii. A sentence of probation with home confinement will not create an unwarranted disparity with other similarly situated cases.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Cliff's conduct and others on Jan 6. Like many Jan 6 defendants, he had been subjected to a torrent of propaganda and lies that the election had been stolen and that democracy was on the brink of collapse. Like hundreds of others, he engaged with police officers. But unlike the vast majority of January 6 protestors, he was a teenager following his dad to the rally. Unlike many, he did not pre-plan any attack, and he is not and was not affiliated with an extremist organization. To the contrary, in the months leading up to January 6, Cliff was a typical teenager—he was focused on work and hanging out with this friends. The following cases demonstrate that probation is fair and reasonable and will avoid unwarranted disparity with other similarly situated cases.

### *United States v. Grayson Sherrill*, 1:21CR282 (TSC)

*United States v. Grayson Sherrill* serves as an apt comparison to Mr. Mackrell's case because Mr. Sherrill was also one of the youngest defendants sentenced for offenses arising out of January 6. On January 6, Mr. Sherrill was 21 years old, almost two years older than Mr. Mackrell. Like Mr. Mackrell, he was convicted under 18 U.S.C. §111(a). Mr. Sherrill, however, engaged in more culpable conduct than Mr. Mackrell. Specifically, as one rioter charged an officer, Mr. Sherrill violently swung and struck the officer with a metal pole.

*Footage showing Mr. Sherrill (in the red shirt) swinging a metal pole and striking an officer*.





*Pole striking officer*

Mr. Sherrill then entered the Capitol building and roamed around for 34 minutes, joining a group of protestors in chanting, "NANCY! NANCY!." Following January 6, Mr. Sherrill deleted videos from his cell phone that he took at the Capitol.[6] Recognizing that Mr. Sherrill was young at the time of the offense, the Honorable Tanya S. Chutkan imposed a sentence of **7 months incarceration**, notwithstanding the government's request for 41 months.

---

[6] *United States v. Grayson Sherrill*, 21CR282 (TSC), Gov. Sentencing Memo, ECF. No. 124.

*United States v. Matthew Council,* **1:21CR207 (TNM)**

Matthew Council's case also serves as a good comparison to this case because Mr. Council suffered from documented mental health issues, as does Clifford Mackrell. Mr. Council, also convicted under 18 U.S.C. § 111(a)(1), rammed into a line of police officers. He later made his way up to the Senate Wing Door—despite being pepper sprayed, and he struck his fist in the pane of the door for about two minutes.



*Mr. Council screaming at police after being pepper sprayed*



After being pepper sprayed, Mr. Council entered the building, where he claimed to have encouraged others to steal a laptop. After January 6, unlike Cliff, Council was active on social media and was an outspoken advocate for overthrowing the

government.[7] The district judge rejected the government's request for a lengthy period of incarceration and imposed **60 months probation** instead.

### *United States v. Phillip Young*, 1:21CR617 (DLF)



Defendant Phillip Young was also convicted under 18 U.S.C. § 111(a)(1) for rushing up stairs towards a police line and, along with several other protestors, lifting a barricade off the ground and pushing it towards police officers. When the group was unable to breach the security line the first time, Mr. Young tried again and pushed the barricade towards police officers a second time.

After assaulting officers with the barricade, Mr. Young let the air out of the tires of a government vehicle parked on Capitol grounds. When he was later interviewed by FBI, Mr. Young said that he laughed at an officer when the officer told him to back down. He claimed his purpose in going to the rally on January 6 was for a last "joy ride."[8] The Honorable Judge Friedrich imposed a sentence of **8 months**, notwithstanding the government's request of 30 months.

---

[7] *United States v. Matthew Council*, 21CR207 (TNM), Gov. Sentencing Memo, ECF. No. 64.

[8] *United States v. Philip S. Young*, 21CR617 (DLF), Gov. Sentencing Memo, ECF. No. 35.

11

The above cases show that a sentence of probation with home confinement would be consistent with sentences imposed in 111(a) cases in which the defendants presented with mitigating circumstances, like Cliff, who was a teenager with mental health issues.

Meanwhile, the cases the government cites are easily distinguishable. First, the government points to *United States v. Creek*, 1:21CR645 (DLF) in which the defendant was sentenced to 27 months. Gov. Memo at 24. Mr. Creek was a former U.S. Marine at the time he assaulted officers. In addition, unlike Cliff, he was armed with a knife when he entered the Capitol grounds.[9] Next, the government points to *United States v. Willden*, 1:21CR423 (RC). Mr. Willden was also a grown man on January 6, not a teenager like Cliff. Mr. Willden had prior arrests for violent conduct and was a self-professed Proud Boy. By contrast, Cliff has no prior contacts with the criminal legal system and is not a member of an extremist organization. Willden, unlike Cliff, entered the Capitol building after assaulting multiple officers.[10] The cases to which the government strains to compare this case show that the requested sentence for Clifford Mackrell is appropriate because he is less culpable than Mr. Creek and Mr. Willden.

---

[9] *United States v. Creek*, 1:21CR546 (DLF), Gov. Sentencing Memo, ECF. No. 48.

[10] *United States v. Ricky Willden*, 21CR423(RC), Sentencing Memo, ECR. No. 38.

12

### iv. A sentence of probation including home confinement and mental health treatment—along with the collateral consequences that attach to a felony conviction—will achieve the goals of sentencing.

Cliff's arrest was publicized in his community. As soon as he pleaded guilty, he was let go from his job. He is having a hard time finding employment. The collateral consequences that attend to Mr. Mackrell's felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[11]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their

---

[11] *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

13

>reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

Supp. at 3d at 179 *(*internal quotations, alterations, and citations omitted*)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence . . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180; *see also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence"). The collateral consequences that Cliff has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence."

First, as already described, Cliff lost his job as a result of his conviction. Second, prior to his convictions, he was a lawful firearms owner. Though he was never a firearms enthusiast *per se*, he treasured his Second Amendment right to possess a

firearm should there be a need to defend himself or his family. He will not be able to possess a firearm for the rest of his life. These long-lasting and irreversible consequences, in addition to a sentence of supervision and a period of supervision are sufficient to meet the goals of 3553(a).

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[12] In short, there is little empirical support for the prospect that a lengthy period of confinement will be any more effective at deterring Mr. Mackrell or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not

---

[12] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

Finally, locking up and further disenfranchising an obscure young man from Ohio will do nothing to deter others from engaging in such conduct, especially when the powerful organizer of the rally remains free and on track to be the nominee for the President of the United States again.

## Conclusion

Clifford Mackrell has admitted to, and feels ashamed for, the crimes that he committed. He has lost a job and his liberties and his freedom over the past two years. Counsels recommend that a sentence that is sufficient and not more than necessary is one that avoids additional active incarceration and that restrains Mr. Mackrell's freedoms of movement and choices in the community, with the clear message that any errors on his part can result in a revocation of his supervision and a return to the loss of his freedom and a prospective lengthy sentence of imprisonment.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500